```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
In re EPHEDRA PRODUCTS LIABILITY      :
LITIGATION                            :    04 MD 1598 (JSR)
------------------------------------- x
In re MUSCLETECH RESEARCH AND         :
DEVELOPMENT INC., et al.;             :
                                      :
Foreign Applicants in Foreign         :    06 Civ. 538 (JSR)
Proceedings.                          :
                                      :
------------------------------------- x
In re RSM RICHTER INC., AS FOREIGN    :
REPRESENTATIVE OF MUSCLETECH RESEARCH :
AND DEVELOPMENT INC. AND ITS          :    06 Civ. 539 (JSR)
SUBSIDIARIES,                         :
                                      :
                 Plaintiff,           :
                                      :
         -v-                          :
                                      :
SHARON AGUILAR, an individual; et     :    OPINION AND ORDER
al.,                                  :
                                      :
                 Defendants.          :
------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Before the substance known as ephedra was banned by the U.S. Food and Drug Administration in 2004, a Canadian-based company named Muscletech Research and Development, Inc. (here referred to, along with its subsidiaries, as "Muscletech") marketed products containing ephedra in the United States. Some of the consumers suffered severe injuries, such as heart attacks and strokes, and eventually more than thirty civil actions for personal injuries and wrongful deaths allegedly caused by ephedra were filed against Muscletech in state and federal courts in the United States. As part of the <u>In re Ephedra Products Liability Litigation</u>, the federal cases were subsequently transferred to this Court.

Early in 2006, Muscletech commenced an insolvency proceeding in Ontario Superior Court pursuant to Canada's Companies' Creditors Arrangement Act. The Ontario Court appointed RSM Richter, Inc. as Monitor, and the Monitor, in turn, appeared in this Court as the designated foreign representative of the Ontario Court. Acting pursuant to the recently enacted Chapter 15 of the Bankruptcy Code, 11 U.S.C. §§ 1501 et seq.,[1] this Court eventually granted, following several hearings, the Monitor's motion for an order recognizing the Canadian proceeding as a "foreign main proceeding," i.e., "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502; see Order, Mar. 2, 2006. Thereafter, the state cases against Muscletech were transferred to this Court pursuant to 28 U.S.C. § 157(b)(5) and consolidated with the previously transferred federal cases. See Case Management Order No. 25 ¶ 4, May 22, 2006.

Meanwhile, in Canada, the Monitor and other interested parties negotiated a Claims Resolution Procedure (the "Procedure") designed to speedily assess and value all creditor claims, including the claims of the plaintiffs in the Muscletech actions in the United States, who by this time had filed claims and otherwise appeared in the Ontario insolvency proceeding. The Procedure was approved by the Ontario Court, with the consent of the vast majority of claimants, on June 8,

---

[1] Chapter 15, which took effect in October 2005, was derived from the Model Law on Cross-Border Insolvency drafted by the United Nations Commission on International Trade Law ("UNCITRAL").

2

2006 (the "June 8 Order"). On June 16, 2006, the Monitor moved pursuant to 11 U.S.C. §§ 105(a) and 1521 for an order recognizing and enforcing the June 8 Order within the United States. Four claimants filed papers in opposition. On July 12, 2006, after briefing and oral argument, the Court granted the Monitor's motion, contingent on the Ontario Court's approving certain amendments to the Procedure designed to assure greater clarity and procedural fairness. The Ontario Court approved these amendments on August 1, 2006 (the "August 1 Order"). Accordingly, this Court now grants the Monitor's motion to recognize and enforce in the United States the August 1 Order approving the amended Procedure. The reasons for this ruling are as follows:

Section 1521(a) of the Bankruptcy Code permits this Court, "[u]pon the recognition of a foreign proceeding," to grant, at the foreign representative's request, "any appropriate relief" "necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Section 105(a) of the Bankruptcy Code similarly provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Id. § 105(a). In the instant application, the Monitor asks the Court to recognize and enforce a foreign procedure that implements a claims resolution process that easily falls within the purview of §§ 105(a) and 1521(a).

Section 1506 of the Bankruptcy Code provides, however, that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly

3

contrary to the public policy of the United States." The June 8 Order and the August 1 Order embodying the amended Procedure provide for mandatory mediation and, if the mediation results in a plan approved by specified majorities of creditors, for the estimation and liquidation of the remaining claims by a Claims Officer appointed by the Ontario Court. See Notice of Motion, Jun. 16, 2006, Exh. B (the June 8 Order); Notice of Entry, Aug. 1, 2006, Exh. A (the August 1 Order). Primarily on the basis of § 1506, the four objectors ask this Court to refuse to recognize and enforce the Procedure, arguing that it is manifestly contrary to the public policy of the United States in that it deprives the objectors of due process and trial by jury.

As to due process, while most of the objectors' objections are frivolous, there were various paragraphs of the June 8 Order that conceivably could have been read as permitting the Claims Officer to refuse to receive evidence and to liquidate claims without granting interested parties an opportunity to be heard. At this Court's initiative, the Monitor proposed amendments to the June 8 Order that entirely cured these problems. The Ontario Court promptly adopted these amendments in its August 1 Order, and it is only as a result that this Court now gives its approval to recognition and enforcement of the Procedure.

As for the objection that enforcement of the Procedure effectively denies the objecting plaintiffs the right to jury trial that they would have retained if their cases went to trial in the United States, it may well be the case, as the Monitor argues, that the objectors waived this objection when they filed their claims in

4

the Ontario Court and appeared there to argue the same objections they here make.[2]  See Reply Mem. of Law of RSM Richter Inc. 7; Tr. 7/6/2006, at 54, 57-58.  But the Court does not reach the waiver issue because it finds that, in any event, neither § 1506 nor any other law[3] prevents a United States court from giving recognition and enforcement to a foreign insolvency procedure for liquidating claims simply because the procedure alone does not include a right to jury.

In adopting Chapter 15, Congress instructed the courts that the exception provided therein for refusing to take actions "manifestly contrary to the public policy of the United States" should be "narrowly interpreted," as "[t]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States."  H.R. Rep. No. 109-31(I), at 109, as reprinted in 2005 U.S.C.C.A.N. 88, 172.  This is the standard meaning accorded the word "manifestly" in international law when it refers to a nation's public policy.  Indeed, the official

---

[2]Although it might also be argued that the objection to the denial of a jury trial is premature because, at this stage, the Claims Officer has not begun the liquidation process, the Court agrees with the objectors that denial of a jury trial impacts their bargaining position at every stage of the implementation of the Procedure.

[3]The objectors also purport to rely on 11 U.S.C. § 1507, which, however, adds nothing to the arguments made under § 1506.  Although none of the objectors relied on, or even cited, 28 U.S.C. § 1411 -- which provides that, except in the case of involuntary bankruptcies, "this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim,"  28 U.S.C. § 1411(a) (emphasis added) -- nevertheless, the Court, sua sponte, raised § 1411 at the time of oral argument and gave the objectors ample opportunity to address its relevance. See Tr., 7/6/2006, at 9-75.

5

Guide to the Enactment of the Model Law on Cross-Border Insolvency (from which Chapter 15 derives) expressly states that

> [t]he purpose of the expression "manifestly," used also in many other international legal texts as a qualifier of the expression "public policy," is to emphasize that public policy exceptions should be interpreted restrictively and that article 6[4] is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

United Nations General Assembly, Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency, ¶ 89, U.N. Doc A/CN.9/442 (1997). This takes on even added relevance when one recognizes that the House Judiciary Committee, in enacting Chapter 15, specifically indicated that the Guide "should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions." H.R. Rep. No. 109-31(I), at 106 n.101, as reprinted in 2005 U.S.C.C.A.N. 169 n.101.

Determining what foreign procedures are "manifestly contrary to the public policy of the United States" is, moreover, familiar territory to federal courts, who have long had to confront similar issues when determining whether or not to enforce foreign judgments rendered on the basis of foreign proceedings that were plainly fair but that did not include some commonplace of American practice. As early as 1895, in the leading case of Hilton v. Guyot, 159 U.S. 113 (1895), the Supreme Court determined that a foreign judgment should generally be accorded comity if "its proceedings are according to the course of a civilized jurisprudence," i.e., fair and impartial.

---

[4] "Article 6" refers to Article 6 of the Model Law, from which section 1506 is taken virtually verbatim.

6

Hilton, 159 U.S. at 205-06. More recently, in Ackermann v. Levine, 788 F.2d 830 (2d Cir. 1986), the Second Circuit expressly reaffirmed "[t]he narrowness of the public policy exception to enforcement [of foreign judgments]," adding that, "[a]s Judge Cardozo so lucidly observed: 'We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.'" Ackermann, 788 F.2d at 842 (quoting Loucks v. Standard Oil Co., 224 N.Y. 99, 110-11 (1918) (Cardozo, J.)).

Accordingly, federal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign. Only last year, for example, the district court for the Northern District of Ohio granted summary judgment to a plaintiff seeking to enforce against a U.S. company a foreign judgment given by the Supreme Court of the Republic of Korea. See Samyang Food Co. v. Pneumatic Scale Corp., No. 05 Civ. 636, 2005 WL 2711526 (N.D. Ohio Oct. 21, 2005). Against defendant's argument that the Korean judgment should not be recognized because South Korea did not afford defendant a jury trial, the district court held that all that was required was a fair and impartial hearing and that, despite the absence of jury trial, the Korean procedure was eminently fair. Samyang Food, 2005 WL 2711526, at *6-*7. As the district court noted, "[t]he Korean judicial system provides substantially the same substantive and procedural due process protections as those afforded by Ohio," viz., "notice, the right to . . . legal counsel, the right to present evidence and witnesses and to examine evidence offered against them, and a right to appeal to a higher court." Samyang Food,

7

2005 WL 2711526, at *6. All these protections are likewise present in the Ontario Court.

Similarly, federal courts, in the Second Circuit and elsewhere, have regularly dismissed U.S. cases in favor of foreign forums despite the objection that the foreign forum provides no trial by jury. See, e.g., Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 768 (9th Cir. 1991) (finding, in affirming forum non conveniens dismissal, that fact that Japan would not conduct jury trial to resolve dispute "does not render Japanese courts an inadequate forum"); In re Union Carbide Corp. Gas Plant Disaster at Bhopal, 809 F.2d 195, 199, 202 (2d Cir. 1987) (affirming district court's forum non conveniens dismissal based on finding that Indian courts were adequate forum despite, inter alia, absence of juries).

Obviously, the constitutional right to a jury trial is an important component of our legal system, and § 1411 stresses its importance in the context of personal injury cases. But the notion that a fair and impartial verdict cannot be rendered in the absence of a jury trial defies the experience of most of the civilized world. Indeed, England, where the jury concept originated, has long since limited jury trials in civil proceedings to only those cases involving allegations of libel, slander, malicious prosecutions, fraud, and false imprisonment. See Richard L. Marcus, Putting American Procedural Exceptionalism Into a Globalized Context, 53 Am. J. Comp. L. 709, 712-13 (2005) (internal quotation omitted). The historic function of the jury to stand as a bulwark against government abuse plainly has limited application in the civil arena, and it is

8

difficult to detect what unfairness a plaintiff suffers from having a civil case decided by a judge rather than a jury. Here, the objectors' primary claim of "prejudice" from the absence of a right to jury trial is simply that it will give them less of a bargaining position in negotiating a settlement of their claims than they would have if a jury -- which, unlike the Claims Officer, would have no knowledge of competing claims -- were asked to value their claims. See Tr., 7/6/2006, at 37, 40. Deprivation of such bargaining advantage hardly rises to the level of imposing on plaintiffs some fundamental unfairness.

In any event, the Procedure here in issue, as amended, plainly affords claimants a fair and impartial proceeding. Nothing more is required by § 1506 or any other law.

Accordingly, for the foregoing reasons, the Court hereby recognizes and enforces the Claims Resolution Procedure initially promulgated by the Ontario Superior Court on June 8, 2006 and amended and adopted by the Ontario Superior Court on August 1, 2006.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
August 11, 2006

9



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-15-06